UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PLANNED PARENTHOOD SOUTHEAST, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, *et al.*, <br><br> Defendants, <br><br> and <br><br> STATE OF GEORGIA, <br><br> Intervenor-Defendant. | Civil Action No. 1:21-cv-00117 (JEB) |

**FEDERAL DEFENDANTS' CONSENT MOTION TO STAY PENDING FEDERAL DEFENDANTS' FURTHER EVALUATION OF THE GEORGIA ACCESS MODEL**

Federal Defendants respectfully move, with the consent of all other parties, to stay this case for 90 days, until September 13, 2021, while they reevaluate the challenged waiver in light of additional information recently requested from the State of Georgia. In support of this motion, Federal Defendants state:

1. Plaintiffs filed their Complaint on January 14, 2021. *See* Compl., ECF No. 1. Defendants' response to the Complaint is currently due on June 24, 2021. *See* Minute Order of May 14, 2021.

2. Plaintiffs' Complaint challenges the "Georgia Access Model," a portion of the State Innovation Waiver requested by Intervenor-Defendant, the State of Georgia, under the Affordable Care Act and approved on November 1, 2020, by the Secretaries of Health and Human Services

and Treasury. Plaintiffs allege that the Georgia Access Model "violates the statutory guardrails" of Section 1332 of the Affordable Care Act. Compl. ¶ 4.

3. On June 3, 2021, Defendant Chiquita Brooks-LaSure, Administrator of the Centers for Medicare & Medicaid Services, sent a letter to Brian Kemp, Governor of Georgia, on behalf of the U.S. Department of Health and Human Services and the Department of Treasury, requesting additional analysis of the Georgia Access Model by July 3, 2021, in order "to evaluate whether the Georgia Access Model will satisfy the statutory guardrails" in light of relevant changes to federal law and policy. *See* Ex. A (June 3, 2021 Letter from Brooks-LaSure to Kemp) at 6. Upon receipt, Federal Defendants will publicly post Georgia's additional analysis, which will then be subject to a 30-day public comment period, at which point the Departments will "further evaluat[e] . . . whether [the Georgia Access Model] meets the statutory guardrails in light of these changes in law and policy." *Id.* at 8.

4. Accordingly, Federal Defendants request that the Court stay this case for 90 days, until September 13, 2021, in order for Georgia to submit the requested analysis, for the analysis to be available for a public comment period, and for Federal Defendants to commence further review of whether the Georgia Access Model—the subject of this lawsuit—continues to meet Section 1332 of the ACA's statutory guardrails, with the parties to submit a status report at the end of the 90-day period.

5. Counsel for Federal Defendants have conferred with counsel for the other parties, who consent to the requested relief.

Dated: June 14, 2021                             Respectfully submitted,

                                                 BRIAN M. BOYNTON
                                                 Acting Assistant Attorney General

Civil Division

ERIC B. BECKENHAUER
Assistant Branch Director

/s/ *Christopher M. Lynch*
CHRISTOPHER M. LYNCH
(D.C. Bar No. 1049152)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. St., N.W.
Washington, D.C. 20005
Telephone: (202) 353-4537
Facsimile: (202) 616-8470
Email: Christopher.M.Lynch@usdoj.gov

*Counsel for Defendant*

# Exhibit A



**DEPARTMENT OF HEALTH & HUMAN SERVICES**     Centers for Medicare & Medicaid Services

Administrator
Washington, DC 20201

June 3, 2021

**VIA ELECTRONIC MAIL:** ryan.loke@georgia.gov

The Honorable Brian P. Kemp
Governor, State of Georgia
115 State Capitol
Atlanta, Georgia  30334

Dear Governor Kemp:

As you know, the U.S. Department of Health and Human Services (HHS) and the Department of Treasury (collectively, the Departments) are committed to working in partnership with states on policies that affect health care coverage in their states.  Through section 1332 waivers, the Departments aim to assist states with developing health insurance markets that expand coverage, lower costs, and ensure that health care truly is a right for all Americans.  On November 1, 2020, the Departments approved Georgia's State Innovation Waiver (Georgia waiver) under section 1332 of the Patient Protection and Affordable Care Act (ACA), the first part of which would not take effect until January 1, 2022.[1]  I am sending this letter from the Centers for Medicare & Medicaid Services (CMS) within HHS on behalf of both Departments in regards to this waiver.

Since that time, there have been changes in both health care priorities and policies, as well as federal law.  On January 20, 2021, the President issued the Executive Order 13985, Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, directing the federal government to pursue a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality.  Executive Order 13985 directs HHS to assess whether, and to what extent, its programs and policies perpetuate systematic barriers to opportunities and benefits for people of color and other underserved groups.[2]  This was followed by Executive Order 14009, Strengthening Medicaid and the Affordable Care Act,[3] under which the Departments were directed to review all agency actions to protect and strengthen the Affordable Care Act. Consistent and in line with these priorities, the President signed the American Rescue Plan Act of 2021 (ARP) into law on March 11, 2021, which make numerous changes to the ACA to expand access to health insurance coverage and lower costs for consumers.[4]

---

[1] The Georgia 1332 waiver approval package is available at https://www.cms.gov/CCIIO/Programs-and-Initiatives/State-Innovation-Waivers/Section_1332_State_Innovation_Waivers-/1332-GA-Approval-Letter-STCs.pdf.
[2] See https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/.
[3] See https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/28/executive-order-on-strengthening-medicaid-and-the-affordable-care-act/.
[4] See https://www.congress.gov/bill/117th-congress/house-bill/1319/text

Section 1332 of the ACA provides the Secretary of HHS and the Secretary of the Treasury (collectively, the Secretaries) with discretion to waive specific provisions of the ACA (a State Innovation Waiver or section 1332 waiver) only if the Secretaries determine that the state's waiver application meets statutory requirements (referred to as the statutory guardrails) and certain procedural requirements specified in regulation.  The Departments have authority to request information for an approved waiver as part of their continued monitoring and oversight authority and retain discretion to "amend, suspend, or terminate the waiver . . . as necessary to bring the waiver . . . into compliance with changes to existing applicable federal statutes enacted by Congress or applicable new statutes enacted by Congress."[5]  The Departments continue to exercise their monitoring and oversight responsibilities through regularly scheduled implementation and operational reports, operational readiness reviews and open enrollment readiness reviews, and through longstanding, regular monitoring and implementation calls between the Departments and states with approved waivers.

As a result of these Executive actions and changes in the law, the Departments request an updated analysis by July 3, 2021, which is 30 days from the date of this letter, to reflect the changes in circumstances that impact the baseline waiver scenario (i.e., the Georgia without waiver scenario) for Part II of the Georgia waiver, the Georgia Access Model, as detailed below.

BACKGROUND ON THE GEORGIA SECTION 1332 WAIVER
On November 1, 2020, the Secretaries approved Georgia's section 1332 waiver plan effective January 1, 2022, through December 31, 2026, that consists of two parts.[6]  In Part I Georgia requested a waiver of the ACA requirement for the individual market single risk pool in section 1312(c)(1) as necessary in order to implement a Reinsurance Program for up to five years beginning with plan year (PY) 2022.  In Part II, Georgia requested a waiver of certain requirements for its Exchange in section 1311 of the ACA to implement and operate the Georgia Access Model, which would begin in PY 2023.  Although the waiver plan was approved in November 2020, the Georgia Access Model has not yet been implemented, and would begin in 2023 consistent with the terms of the waiver plan.

When Georgia submitted its waiver request, the state indicated it was experiencing a substantial decline in enrollment through the Federally-facilitated Exchange (FFE) on a year-by-year basis. Yet, data from the state's own application demonstrated that there was still a significant need for the FFE in getting people coverage.  Unsubsidized enrollment dropped by 72 percent (approximately 150,000 individuals) between 2016 and 2019 in Georgia.[7]  In addition, in 2019 the State had one of the highest uninsured rates in the country at 13.4 percent (1.39 million people) across the state.[8]  According to the state's application, over half of the uninsured

---

[5] See GA STC 7 (Changes in Applicable Federal Laws) and GA STC 15 (Federal Evaluation), available at: https://www.cms.gov/CCIIO/Programs-and-Initiatives/State-Innovation-Waivers/Section_1332_State_Innovation_Waivers-/1332-GA-Approval-Letter-STCs.pdf.  Also see 31 C.F.R. § 33.120(a)(1) and (f) and 45 C.F.R. § 155.1320(a)(1) and (f). Also see GA STC 14 and 17.
[6] The Georgia section 1332 waiver approval package is available at https://www.cms.gov/CCIIO/Programs-and-Initiatives/State-Innovation-Waivers/Section_1332_State_Innovation_Waivers-/1332-GA-Approval-Letter-STCs.pdf.
[7] U.S. Census Bureau, 2019 ACS 1-year Estimates, Table S2701. See https://data.census.gov/cedsci/table?q=S2701&tid=ACSST1Y2019.S2701
[8] U.S. Census Bureau, 2019 ACS 1-year Estimates, Table S2701. See https://data.census.gov/cedsci/table?q=S2701&tid=ACSST1Y2019.S2701

(795,000 people) in Georgia had household income between 100 percent and 400 percent of the Federal Poverty Level (FPL) and would have been eligible for federal subsidies; however, these consumers were not enrolling in subsidized coverage through the FFE.  These data points were a core part of the state's actuarial analysis for its baseline without-waiver scenario and the population that the state was trying to address through its waiver plan.[9]

Under Part I, Georgia is implementing a state reinsurance program for up to five years beginning with PY 2022.  The Georgia Reinsurance Program will operate with a traditional, claims-based attachment point model by reimbursing qualifying non-grandfathered individual health insurance coverage for a percentage of an enrollee's claims costs exceeding a specified threshold (attachment point) and up to a specified ceiling (reinsurance cap).  The Georgia Reinsurance Program will have a tiered coinsurance structure to provide greater premium relief to targeted areas of the state and to encourage more carriers to participate in parts of the state where there is less carrier participation.  Specifically, in PY 2022, the program will reimburse claims at an average 27 percent coinsurance rate for claims between the attachment point of $20,000 and a $500,000 cap.

Under Part II, Georgia Access Model, the private sector would provide the front-end functions for consumer outreach, customer service, plan shopping, selection, and enrollment and would leverage incentives that already exist in the market today.  Plans would no longer be displayed or otherwise available on HealthCare.gov for one-stop shopping, eligibility determinations, or plan selection, and there would be no State Exchange.  Instead, the consumer would be connected to a state website, where they would see a list of multiple, privately operated websites linking to approved issuers and web-brokers available to assist with the application and enrollment processes.  Consumers in Georgia will continue to be eligible to receive federal subsidies.  Georgia will validate eligibility information and determine if an applicant is eligible for QHPs, advance payments of premium tax credits (APTC), and cost-sharing reductions (CSRs).  The state will send that information to CMS, which will continue to issue the applicable APTC to carriers on behalf of qualified individuals, and to the Internal Revenue Service (IRS), which will continue to administer the reconciliation of APTC on individual tax returns.

The outreach efforts under Georgia Access Model, starting January 1, 2023, will be funded by uncertain and unquantified private sector efforts, not by the state; and under the Georgia Access Model the FFE would not be doing outreach and marketing.  In its application, Georgia neither quantified the size of the expected investment by the private sector nor indicated any specific commitments by the private sector to engage in outreach and marketing.  Rather, the state posited that, without the competition from HealthCare.gov (which at the time was only spending $10 million in outreach nationally[10]), the private sector would be incentivized to invest more towards these efforts than the FFE was investing at the time.  As such, it is unclear if the private market's outreach efforts in Georgia under the Georgia Access Model, where there would be no FFE investment, would be comparable to FFE investments that would take place in the without waiver baseline scenario (which nationally is currently $100 million for outreach for the special

---

[9] As detailed further below, there have been recent changes in circumstances that have increased enrollment through the Georgia FFE such that the Departments are reevaluating the baseline actuarial analysis for the Georgia Access Model.

[10] https://www.cms.gov/newsroom/fact-sheets/federal-health-insurance-exchange-2020-open-enrollment

enrollment period (SEP) for the COVID-19[11] and $80 million for Navigators, alongside an expected increase in open enrollment outreach efforts, as further discussed below).

RECENT CHANGES IN FEDERAL LAW
The ARP, enacted in March 2021, expanded eligibility for and increased the value of the ACA's Premium Tax Credits (PTC), enabling previously ineligible consumers to qualify for help paying for health coverage and increasing assistance to eligible individuals already enrolled in Exchange plans.  These actions lowered the cost of health care coverage for millions of Americans.  Further, the ARP's enhanced assistance has changed the incentives to seek coverage for uninsured consumers across the country.  In light of recent increases in individual Exchange enrollment, when the Georgia Access Model begins in 2023 it is possible that Exchange enrollment will be higher than when the state applied for the waiver.  These new enrollees, like the existing enrollees, would be subject to a transition to a new system.  The Departments also anticipate that these enrollment incentives could potentially change market dynamics and reduce incentives for private sector entities to enroll uninsured consumers, as there will be a smaller base of uninsured consumers to enroll.

The ARP enhanced subsidies, combined with Administration actions to increase funding for outreach, marketing, and in-person assistance, are already increasing enrollment and will reduce the cost of healthcare coverage for many who are uninsured and those currently receiving financial assistance.  Implementation of the ARP provides more than 14.9 million Americans who currently lack health insurance, as well as many current enrollees, additional financial support to obtain health insurance coverage.[12]  In the first ten weeks of the COVID SEP, which ran from February 15, 2021, to April 30, 2021 and offered broader eligibility criteria than the SEP types available in prior years,[13] more than 940,000 people signed up for Exchange coverage through HealthCare.gov – which is more than double the number of consumers who signed up with a SEP during the same time period in 2020.  In Georgia, there were 67,445 new plan selections on HealthCare.gov in the first ten weeks of the COVID SEP, which is more than three times the number of people who signed up with a SEP in the same time frame in 2020 and over five times the number who signed up in 2019.[14]

In addition, data shows that substantially more consumers enrolled in coverage at the beginning of the 2021 plan year than had enrolled at the start of the 2020 plan year.  Approximately 12 million consumers selected or were automatically re-enrolled in an Exchange plan during the 2021 open enrollment period in the 50 states plus the District of Columbia.  This is a 5 percent nationwide enrollment increase for the 2021 coverage year, from the 11.4 million consumers who enrolled during the 2020 open enrollment period.[15]  In Georgia, open enrollment period

---

[11] CMS announced $50 million for outreach and marketing for the COVID SEP and $50 million to further bolster the COVID SEP campaign and promote the lower premiums under the ARP for plan year 2021. See https://www.cms.gov/newsroom/fact-sheets/2021-special-enrollment-period-response-covid-19-emergency and https://www.cms.gov/newsroom/press-releases/hhs-secretary-becerra-announces-more-500000-americans-have-enrolled-marketplace-coverage-during.
[12] See https://aspe.hhs.gov/pdf-report/estimates-of-the-qhp-eligible-uninsured.
[13] In previous years, SEPs were available primarily only for qualifying life events, whereas this year the Biden-Harris Administration opened a SEP to all Americans in response to the COVID-19 Public Health Emergency.
[14] 2021 Marketplace Special Enrollment Period Report, May 6, 2021 https://www.cms.gov/newsroom/fact-sheets/2021-marketplace-special-enrollment-period-report-1
[15] See https://www.cms.gov/files/document/health-insurance-exchanges-2021-open-enrollment-report-final.pdf.

enrollment increased by more than twice the national rate, as the state experienced 11 percent higher enrollment in 2021 than in 2020.[16]

EVALUATION OF THE GEORGIA WAIVER GIVEN RECENT ADMINISTRATION POLICIES AND AGENCY ACTIONS

The Administration is committed to protecting and expanding Americans' access to quality, affordable health care, making the health care system easier to navigate, and meeting the health care needs created by the COVID-19 public health emergency (PHE).  Through section 1332 waivers, the Departments aim to assist states with developing health insurance markets that expand coverage, lower costs, and ensure that healthcare truly is a right for all Americans.  The Departments are of the view that as we continue to battle COVID-19 during the PHE, where millions of Americans are experiencing new health problems and are facing both uncertainty and the possibility of lingering health consequences of COVID-19 infections, it is even more critical that Americans have meaningful access to affordable coverage and care.

*Part I*

The Departments are reviewing all section 1332 waivers in light of these recent changes in federal law and policies, including Executive Order 13985 and Executive Order 14009.  Several states have used section 1332 waivers to implement state-based reinsurance programs (reinsurance waivers) that have lowered premiums when compared to the premiums in the without waiver baseline scenario.[17]

Part I of Georgia's waiver is similar to the approach taken by other states' approved reinsurance waivers.[18]  On April 21, 2021, the Departments announced that they will re-calculate 2021 pass-through funding for approved reinsurance waivers based on the passage of the ARP.[19]  In addition, the Departments will carry out their review of reinsurance waivers through their current monitoring and oversight activities, including state reporting requirements and monitoring calls.[20]  The Departments also have existing metrics and receive data from states on an annual and quarterly basis to monitor the impact of reinsurance waivers on the guardrails by examining enrollment and premium data.  Thus far, there is no indication that reinsurance waivers are unable to continue to meet the guardrails.  Therefore, the Departments have determined that Part I of the Georgia waiver plan, which establishes a state-based reinsurance program, does not require further evaluation at this time.[21]

---

[16] See https://www.cms.gov/research-statistics-data-systems/marketplace-products/2021-marketplace-open-enrollment-period-public-use-files.

[17] See https://www.cms.gov/CCIIO/Programs-and-Initiatives/State-Innovation-Waivers/Downloads/1332-Data-Brief-June2020.pdf.

[18] For example, Georgia modeled their reinsurance program after Colorado which has a tiered coinsurance structure for the reinsurance parameters.

[19] See https://www.cms.gov/CCIIO/Programs-and-Initiatives/State-Innovation-Waivers/Downloads/1332-ARP-and-Pass-through-Funding-FAQ-2021.pdf

[20] See GA STC 14 (Monitoring Calls) which notes that the "purpose of these monitoring calls is to discuss any significant actual or anticipated developments affecting the waiver…. the Departments will update the state on any federal policies and issues that may affect any aspect of the waiver." The Georgia 1332 waiver approval package is available at: https://www.cms.gov/CCIIO/Programs-and-Initiatives/State-Innovation-Waivers/Section_1332_State_Innovation_Waivers-/1332-GA-Approval-Letter-STCs.pdf.

[21] While the Departments are not conducting a further evaluation of Part I of the Georgia waiver at this time, as noted above, the Departments are monitoring the impact of recent changes in federal law on state approved section 1332 reinsurance programs

*Part II*
The Departments have determined that Part II of the Georgia waiver, the Georgia Access Model, requires further evaluation, because the recent changes in federal law and other circumstances identified below warrant confirming whether Part II of Georgia's waiver plan will meet the statutory guardrails.  The changes described in this letter are likely to increase enrollment through the Exchange in Georgia and, as noted, in some cases have already increased enrollment.  Further, due to inertia in coverage selections, the Departments expect the enrollment effects to continue even after the federal changes and the COVID SEP are no longer in effect.   For example, researchers have found that the effects of outreach on increasing health insurance coverage persist beyond a single plan year.  A recent study of IRS outreach (in which the IRS sent informational letters to uninsured taxpayers) found that after two years, coverage among outreach recipients remained approximately 0.7 percentage points higher relative to coverage among those who did not receive outreach.[22]  Further, research has shown the type of outreach or advertising can also impact enrollment.  A different study found that government advertising increases overall enrollment and enhances welfare; however, that study also found that *private* advertising by individual insurers does not similarly result in increased enrollment overall.[23]

REQUEST FOR UPDATED GEORGIA ACCESS MODEL ANALYSIS
Accordingly, the Departments are requesting that Georgia submit an updated actuarial and economic analyses for Part II of the Georgia waiver, the Georgia Access Model, by July 3, 2021 that accounts for the changes in circumstances outlined in this letter for the period of the Georgia Access Model (PYs 2023–2026).

The updated baseline projections are necessary to allow the Departments to evaluate whether the Georgia Access Model will satisfy the statutory guardrails when the baseline projections are adjusted to include more affordable coverage and higher enrollment (both subsidized and non-subsidized) resulting from the recent changes in federal law and policy, than those Georgia used when it did its prior analysis.  This updated analysis must include[24]:

- Actuarial analyses and actuarial certifications to support the state's estimates that the Georgia Access Model will comply with the comprehensive coverage requirement, the affordability requirement, the scope of coverage requirement, and the requirement to not increase the federal deficit.
- Economic analyses to support the state's estimates that the Georgia Access Model will comply with the comprehensive coverage requirement, the affordability requirement, the

---

(e.g., on pass-thru funding) and will separately follow-up on the reinsurance component of the state's waiver plan as may be necessary.
[22] At its peak immediately following the outreach, coverage among outreach recipients was 1.5 percentage points higher relative to those who did not receive the outreach. See, Jacob Goldin, Ithai Z Lurie, Janet McCubbin, "Health Insurance and Mortality: Experimental Evidence from Taxpayer Outreach, The Quarterly Journal of Economics," Volume 136, Issue 1, February 2021, Pages 1–49, available at https://academic.oup.com/qje/article/136/1/5911132.
[23] Private advertising serves to increase an insurer's share of enrollment without increasing total enrollment. See, Naoki Aizawa, You Suk Kim, "Public and private provision of information in market-based public programs: evidence from advertising in health insurance marketplaces." Revised April 2021, available at  http://www.nber.org/papers/w27695
[24] These mirror the requirements outlined in 31 C.F.R. § 33.108(f)(4)(i)–(iii) and 45 C.F.R. § 155.1308(f)(4)(i)–(iii) and the section 1332 checklist available here: https://www.cms.gov/CCIIO/Programs-and-Initiatives/State-Innovation-Waivers/Downloads/Checklist-for-Section-1332-State-Relief-and_Empowerment-Waivers.pdf.

Case 1:21-cv-00117-JEB   Document 21   Filed 06/14/21   Page 11 of 14

Page 7

scope of coverage requirement, and the requirement to not increase the federal deficit, including:
- A detailed 10-year budget plan that is deficit neutral to the federal government, and includes all costs under the Georgia Access Model, including administrative costs and other costs to the federal government, if applicable; and
- A detailed analysis regarding the estimated impact of the Georgia Access Model on health insurance coverage in the state.

- The data and assumptions used to demonstrate that the state's waiver complies with the comprehensive coverage requirement, the affordability requirement, the scope of coverage requirement, and the requirement to not increase the federal deficit, including:
   - Information on the age, income, health expenses, and current health insurance status of the relevant state population; the number of employers by number of employees and whether the employer offers insurance;[25] cross-tabulations of these variables; and an explanation of data sources and quality; and
   - An explanation of the key assumptions used to develop the estimates of the effect of the Georgia Access Model on coverage and the federal budget, such as individual and employer participation rates, behavioral changes, premium and price effects, and other relevant factors.

The updated analysis must account for the following:

- *Changes in Federal Law*: As noted above, the ARP made numerous changes to the ACA to expand access to health insurance coverage and lower costs for consumers and, therefore, is expected to result in increased enrollment. These changes will allow historically uninsured communities to access coverage, thereby improving opportunities to obtain affordable healthcare coverage during and beyond the COVID-19 pandemic. Specifically, the ARP:
   - Removes the 400 percent FPL cap on household income for determining PTC eligibility, so that households with incomes higher than 400 percent of FPL may also qualify for PTC (for 2021 and 2022 coverage years).
   - Updates the PTC applicable percentage table, which defines what percentage of a household's income is expected to be paid toward a benchmark health insurance premium (for 2021 and 2022 coverage years), thereby increasing PTC and lowering many consumers' share of premium costs for plans purchased on the Exchanges.
   - Changes how household income is counted for households that receive unemployment compensation (UC) for 2021 so that if the taxpayer receives UC for 2021, the household may be eligible for a PTC covering the entire premium cost for certain plans purchased through the Exchanges, and that taxpayer's household could also qualify for cost-sharing reductions (CSRs) (including households with income below 100 percent FPL in states that did not expand Medicaid).

---

[25] To the extent the Georgia Access Model is not expected to impact the employer market, for example, the state's actuarial analysis may assert this and exclude data on the number of employers by number of employees.

- *Increased Federal Outreach Marketing/Navigators*:  When the Departments approved Georgia's waiver, federal funding for the FFE was limited to $10 million nationally for the Navigator program[26] and $10 million nationally for outreach and marketing.[27]  Under this Administration, Navigator funding and outreach and marketing funding has been substantially increased.  Specifically, CMS announced $50 million for outreach and marketing for the COVID SEP[28] and $50 million to further bolster the COVID SEP campaign and promote the lower premiums under the ARP for plan year 2021.[29]  Furthermore, CMS announced $80 million available in grants to Navigators in the FFE for the 2022 plan year.  This represents an eight-fold increase in funding from the previous year.[30]
- *COVID Special Enrollment Period (SEP)*:  The 2021 Executive Order on Strengthening Medicaid and the ACA[31] directed the Secretary of HHS to consider establishment of a SEP.  HHS has made available through HealthCare.gov from February 15, 2021, through August 15, 2021, access to the COVID SEP for Exchanges using the HealthCare.gov platform (including Georgia).  As described earlier in this letter, the number of people signing up for health insurance from the start of the SEP opportunity on February 15, 2021, represents a substantial increase from previous years.

Upon receipt of the state's submission, the Departments will post the state's updated actuarial and economic analysis[32] and provide a 30-day federal public comment period.  This comment period is appropriate to provide stakeholders and the general public an opportunity to review and provide input on the state's updated analysis, which will help inform the Departments' further evaluation of the Georgia Access Model and whether it meets the statutory guardrails in light of these changes in law and policy.[33]

The Departments will review the state's updated analysis to evaluate whether the Georgia Access Model continues to satisfy the statutory guardrails as set forth in section 1332(b)(1)(A)–(D) of the ACA.  If the state wishes to submit to the Departments any additional information that, in the State's view, will aid the Departments in evaluating whether the Georgia Access Model continues to meet the statutory guardrails, such information should be submitted to CMS along with the requested updated actuarial and economic analysis by July 3, 2021.  The state also can request to amend the Georgia Access Model component of its section 1332 State Innovation Waiver, as needed, to come into compliance with the changes in federal law, in light of the other changed circumstances identified in this letter, or for other reasons the state believes are

---

[26] See https://www.cms.gov/newsroom/press-releases/cms-announces-new-funding-opportunity-announcement-federally-facilitated-exchange-navigator-program
[27] See https://www.cms.gov/newsroom/fact-sheets/federal-health-insurance-exchange-2020-open-enrollment
[28] See https://www.cms.gov/newsroom/fact-sheets/2021-special-enrollment-period-response-covid-19-emergency
[29] See https://www.cms.gov/newsroom/press-releases/hhs-secretary-becerra-announces-reduced-costs-and-expanded-access-available-marketplace-health
[30] See https://www.hhs.gov/about/news/2021/04/21/hhs-announces-the-largest-ever-funding-allocation-for-navigators.html; https://www.cms.gov/newsroom/press-releases/cms-announces-additional-navigator-funding-support-marketplace-special-enrollment-period;
[31] See https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/28/executive-order-on-strengthening-medicaid-and-the-affordable-care-act/
[32] The state's updated analysis will be posted and made available at: https://www.cms.gov/CCIIO/Programs-and-Initiatives/State-Innovation-Waivers/Section_1332_State_Innovation_Waivers-
[33] See supra notes 4 and 5.

appropriate within 30 days from the date of this letter, all of which the Departments will evaluate.[34] Once the Departments complete their review of the state's updated analysis, any timely submitted public comments, and any amendment requests, the Departments will promptly notify the state in writing of its determination.

While this review is ongoing, the Departments will continue to engage with Georgia in regular monitoring and implementation calls to discuss any other actual or anticipated developments affecting the waiver, including any state legislative or policy changes, any federal policies or issues that may affect any aspect of the waiver, and any operational or implementation issues that may arise. The Departments also reserve the right to require Georgia to submit an operational readiness review or open enrollment readiness review during the process outlined above as the Departments deem appropriate.

We look forward to working with you on ways to provide residents of Georgia with access to affordable health care coverage. Please send any questions regarding this request or official correspondence concerning the waiver to Lina Rashid at Lina.Rashid@cms.hhs.gov, Michelle Koltov at Michelle.Koltov@cms.hhs.gov, or stateinnovationwaivers@cms.hhs.gov.

Sincerely,

Chiquita Brooks-LaSure

---

[34] For more information see GA STC 10 (State Request for Amendment), available at https://www.cms.gov/CCIIO/Programs-and-Initiatives/State-Innovation-Waivers/Section_1332_State_Innovation_Waivers-/1332-GA-Approval-Letter-STCs.pdf.

cc: Mark Mazur, Deputy Assistant Secretary for Tax Policy, U.S. Department of the Treasury
Gen. John F. King, Commissioner, Georgia Office of the Commissioner of Insurance and Safety Fire
Ryan Loke, Special Projects, Office of Governor Brian Kemp
Matthew Krull, Health Policy Counsel, Georgia Department of Community Health